## REYNOLDS v KENWOOD RIDING CLUB, INC

Ohio Appeals, 1st Dist, Hamilton Co

Decided March 7, 1938

Walter K. Sibbald, Cincinnati, for appellee.

Nichols, Morrill, Wood, Marx & Ginter, Cincinnati, for appellant.

## OPINION

By ROSS, PJ.

The defendant conducted a riding school and rented horses to persons desiring to ride. The plaintiff rented a horse from which she was thrown. Her leg was broken and she brought suit against the defendant for her damages.

She alleged that the defendant was negligent in not providing her with a horse suitable for the purpose of riding, that it was a dangerous animal, vicious, wild and unmanageable, was not broken, trained and exercised; that defendant, failed to provide a proper place to ride, and failed to warn plaintiff that the horse was a hunter and jumper, and failed to equip such horse with the proper kind of bridle and equipment.

The answer was in effect a denial of all of the specifications of negligence.

The record discloses that the plaintiff is a woman, thirty-four years of age, that her weight is about one hundred pounds, and that she is engaged as a laboratory assistant to a physician. She lived upon a farm in Iowa until she was eighteen years of age, rode horses frequently, and was familiar with their management and control. After coming to Cincinnati, she rode occasionally, and took riding lessons at various riding schools in the city.

On the 17th of February, 1936, the plaintiff with two other young women, a Miss Priggs and a Miss Abrams, drove out to the Carthage Fair Grounds where the de-

fendant was then maintaining and operating its riding club. Upon arrival, the employee of defendant brought three horses from its stables to the riding ring, inside a structure, and presented them to the three young women. One of the horses was called "Gypsy," and was considered unsatisfactory by all the young women. None of the party wished to ride the horse because of an objectionable gait peculiar to this horse. The plaintiff was about to mount one of the other two horses remaining when the substitute horse, "Mayo" was brought in. Miss Priggs had mounted the other of the first two horses. Miss Abrams stated she would not ride Mayo, as it was a new horse and she had ridden him before and found him most unsatisfactory. The plaintiff abandoned the horse she was about to mount and mounted "Mayo." The young women then rode the horses into and around the riding ring. The plaintiff had difficulty from the first in managing the horse "Mayo." He swerved from side to side in the ring and the plaintiff was unable to direct him either by bridle, pressure on neck, or body. She complained to one of the members of defendant's organization, who stated the horse had not been recently exercised, and would probably improve in a short time. The tan bark in the ring had not been sprinkled and the dust annoyed the riders so that it was agreed that they should ride outside the building. Before leaving the building, the plaintiff stated she would not continue to ride the horse "Mayo," because she was completely unable to manage of control him. Then an employee of the defendant suggested that they exchange this horse for "Gypsy," but the plaintiff again refused to ride this horse. It was then agreed that another horse would be brought from the stables. The plaintiff states that a Mr. Heitzman, a member of the defendant organization, then stated that as the young women were to ride outside that it would save time if the exchange of horses was made at the stables instead of waiting for the new horse to be brought up to the ring, and that plaintiff should ride "Mayo" to the stables. This is denied by the defendant. In any event, although the plaintiff was about to dismount at the ring, she rode the horse "Mayo" out of the building. The horse bolted for the stable, reared when it found the door thereto closed, wheeled about, ran at a rapid rate down the outside track and ultimately threw the plaintiff, who was unable to control him or keep her seat in the saddle. It is contended by the plaintiff

that part at least of the failure of plaintiff to control the horse was due to the absence of a curb bit.

We have in recounting the facts given the version of the occurrences as the plaintiff contends they existed.

There is nothing in the record justifying a conclusion that the defendant knew of any trait, condition or propensity from which a probability would arise that the horse would run away, which was not as obvious to the plaintiff as to the defendant. There is no evidence that the horse in question possessed any trait, or characteristic which would take it out of the class of animals which any one under similar circumstances might expect to find at a riding school.

The plaintiff was most certainly not a novice in the equestrian art. She had ridden horses frequently all her life. Her ability was known to the defendant. She refused a safe horse and voluntarily accepted one which her companions refused to ride. She continued to ride the horse after she had an opportunity to dismount and had been thoroughly convinced of her inability to control the horse. More than all this, after having demonstrated to herself this inability to control the horse in an inside ring, she voluntarily rode it outside after having been told that it had not been exercised. There is nothing to indicate that the defendant possessed any knowledge of the horse's traits or condition, of which the plaintiff had not been advised or informed before she attempted to ride the horse outside the building.

It is our conclusion that these facts as testified to by the plaintiff, and giving all the evidence in the case a construction most favorable to the plaintiff, that the case of **Riding Academy v Miller, 127 Oh St 545** is directly in point and controlling. The facts in the two cases are very similar, the Miller case containing facts favoring the plaintiff even more than those in the instant case. The syllabus in the Miller case is as follows:

"1. One who rides a horse, which he has hired for that purpose, takes the ordinary risks incident to such pursuit.

"2. In order to recover for injuries received when a horse hired for riding runs and falls, one who sues in tort must show knowledge, on the part of the owner or his agents, of some trait, condition or propensity from which a probability of the horse's running away or falling might reasonably be inferred.

"3. When there is no evidence of any known trait, condition or propensity of the horse, which would subject the rider to greater risks than ordinarily attach to horseback riding, it is error for the trial judge to submit such case to the jury. Defendant's motion for an instructed verdict should be granted."

In this case, Miller, the attendant, made some adjustment of the bridle after complaint by Miss Miller, and she was assured by him that the horse was all right. The horse shortly thereafter fell.

In the instant case the plaintiff's injuries were directly due to her inability to properly handle the horse. Her inability was clearly demonstrated. She had full opportunity to dismount without injury to herself. She did accept, according to her own statement, the suggestion to ride out of the structure. She assumed the risks of continued riding, which were made plain to her by the action of the horse in the ring.

It is our conclusion that the judgment of the trial court shall be reversed, and that judgment be entered in this court for the defendant, appellant.

HAMILTON and MATTHEWS, JJ, concur.