COLE B. McABEE, JESSIE P. McABEE and ELAINE McABEE, Plaintiffs-in-Error, v. J. E. DANIEL, Defendant-in-Error.

COLE B. McABEE, JESSIE P. McABEE and ELAINE McABEE, Plaintiffs-in-Error, v. MELANIE MICHELLE DANIEL, an infant, by next friend, her father, J. E. Daniel, Defendants-in-Error. —445 S.W.2d 917.

Western Section. March 25, 1968.

Certiorari Denied by Supreme Court September 3, 1968.

240

J. Harold Ellis, Memphis, for plaintiffs in error.

Edward C. Duke, Jackson, for defendants in error.

CARNEY, J. The plaintiff below, Melanie Daniel, a minor, suing by her father and next friend, J. E. Daniel, recovered a judgment for $5,000 for personal injuries sustained when bitten by a dog being held on a leash by the defendant Elaine McAbee, also a minor. The father recovered a judgment of $2,250 for medical expenses, loss of services, etc. The cases were tried to the same jury. The defendants moved for a directed verdict at the conclusion of the plaintiffs' evidence. Their motion was overruled and defendants did not offer any proof. The case went to the jury solely on the proof presented in behalf of the plaintiffs below. Defendants have appealed in error from the judgments entered on the verdicts.

The defendants below, Cole B. McAbee and wife, Jessie P. McAbee, are the parents of the defendant, Elaine McAbee, who was the owner of the dog. Elaine McAbee lived in the home of her parents and kept the dog with their knowledge and permission. Judgments were rendered against all three defendants. No contention was made in the court below and no contention is made in this court that the parents, Cole B. McAbee and wife, Jessie P. McAbee, are not liable for the alleged negligent conduct of their daughter, Elaine McAbee. All the assignments of error are predicated upon the theory that none are liable or all three are liable.

Assignment of error No. I that the verdict is contrary to law is insufficient for appeal purposes since it is too general. Rogers v. Murfreesboro Housing Authority, 51 Tenn.App. 163, 365 S.W.2d 441. Assignment of error No. II that there is no material evidence to support the ver-

dict of the jury requires this court to review the evidence heard upon the trial by the jury. McCalla v. Nelson, 44 Tenn.App. 161, 313 S.W.2d 462.

The unfortunate accident occurred on June 26, 1965, about three in the afternoon on Westwood Avenue in Jackson, Tennessee, directly across the street from Tigrett Junior High School. On that afternoon there was a soap box derby being held under the auspices of the Optimist Club of Jackson, Tennessee. Plaintiff J. E. Daniel, father of the minor plaintiff, Melanie Michelle Daniel, was a member of the Optimist Club and assisting in the management of the derby. He was working with the entrants at the starting line. There was a large crowd of spectators lining the street and sidewalk. Elaine McAbee, then aged 15, had taken her dog on a leash to view the soap box derby along with the other spectators. Apparently her father and mother were not present. Estimates of the size of the dog run from twenty to forty pounds. He was from eighteen to twenty inches high. He seemed to be a mongrel. The weather was extremely hot, approaching 100°, and the crowd was noisy and excited.

Sergeant D. L. Murphy of the Traffic Department of the City of Jackson Police with seventeen years' service was on duty at the soap box derby. He noticed Elaine McAbee and her dog and cautioned her to watch the dog since there were children in the street. He explained that the reason he cautioned her was that the dog seemed to be hot and uncomfortable, there was a large crowd and he wanted to make sure that nothing would happen. The dog had shown no signs of viciousness but as he said, "It was an animal among the people."

At first Elaine moved away from the crowd with her dog along the curb but then in the excitement of the race

the crowd moved up close to Elaine and her dog. Mrs. James Daniel, mother of the plaintiff, Melanie Daniel, who was then aged 3, came to view the soap box derby and brought Melanie and also her young son. She had viewed the soap box derby from a point near the finish line for a considerable time and then she went to a point near the starting line. She spoke to her husband about having to leave and then stepped back over to the curb beside Elaine McAbee and the dog.

Melaine started to pet the dog, the dog growled, raised up on its hind legs and pushed Melanie backward so that she fell with her feet at the curb and her head about four feet into the street. The dog then pounced upon her and bit her on the cheek. Melanie screamed, the blood began to flow, and Elaine or someone pulled the dog off Melanie. The mother of Melanie, Mrs. Daniel, testified that she was apprehensive when she heard Melanie talking to the dog and she looked around at Elaine who had the dog on a leash and saw Elaine smile at the dog and at Melanie. In the next instant the dog had attacked Melanie and shoved her across the curb into the street. Mrs. Daniel was not sure whether she actually had Melanie by the hand at the time of the attack nor was she sure whether Melanie ever actually touched the dog.

Mr. Norman Helms, who is an insurance claims adjuster, testified as a witness for the plaintiff that he was present at the soap box derby standing some ten to twelve feet away from Elaine and the dog; that some ten minutes prior to the attack by the dog on Melanie he noticed the dog sitting in Elaine's lap and a Collie dog came up close to the dog in Elaine's lap; that the Collie dog was much larger and seemed to upset the dog in Elaine's lap; that the dog in Elaine's lap bristled his

hair, gave a low growl; Elaine held on to her dog and kept the two dogs from having a confrontation. The Collie dog then walked on off. His account of how the attack occurred is as follows:

"Q.57. How long had she been there before the dog bit her?

A. The best I remember, the little girl came down the street and when I—Of course, when I first saw her she was getting right there in the vicinity of where it happened, and saw the dog, she came up to the dog. About how far away she actually was, maybe twenty feet, or something like that, when I first saw her, away—she was away from me.

Q.58. How far was the dog from the curb of Westwood Avenue when the little girl walked up?

A. Maybe four feet, something like that, three or four feet.

Q.59. Three or four feet from the curb?

A. Maybe five.

Q.60. And where did the little dog—did she walk up and stop?

A. The best I remember, she came along and saw the dog, and came over to pet the dog.

Q.61. Did she say anything to the dog?

A. I remember her saying, 'Nice doggie.' two or three times, and started to petting the dog and petted the dog about twice, I would say.

Q.62. All right, then what happened, Mr. Helms?

A. That is when the dog—after she petted the dog about twice, well, the dog started snapping and going forward, and, of course, the dog caught up with the girl, and the dog—

Q.63. What did the little girl do—Melanie, now, I am talking about, the Daniel girl?

A. The little girl?

Q. The three year old?

A. Well, just as soon as the dog started snapping, well the little girl, of course, was getting her hands back, and she took a step or two backwards, and by that time the dog had caught up with the girl, the dog more or less straddle the girl and was biting her in the face, and she just went over backwards and fell in the gutter.

Q.64. Did Melanie fall in the gutter?

A. That is right, and that is when I lost sight of her, when she went back.

Q.65. Did the dog get down on top of her?

A. Actually, from where I—from where I was sitting, of course, when I saw the dog and the girl, when they were right together, the dog looked like he just had her straddled, more or less, and was at her face, and when she went over backwards, of course there were people sitting down in front of me, and that is when I lost sight of her. Of course, right after—when it happened is when people started moving around.

Q.66. Do you know how the dog—do you know who got the dog off of the girl?

A. Well, the little girl that had the dog still had hold of the leash, and as far as who got the dog off the girl, I don't know.

Q.67. Now, during the time that the dog pursued the little Daniel girl, and, as you say, he got straddle of her, knocked her down in the street, did the other girl still have hold of the leash during all of that?

A. The best I remember, yes sir.

Q.68. Now, what did you do, Mr. Helm?

A. Well, of course, when something like that happens, I just more or less froze, like everybody else did, the best I remember, standing around.

Q.69. Do you know who picked up the Daniel girl, or how she got up?

A. I remember seeing Jimmy Daniels, he had come up, but as far as who got the dog off or who picked her up, I really don't remember. I remember him coming up.''

On cross-examination he testified that in his opinion the defendant, Elaine McAbee, did not actually start pulling back on the leash until the dog had gotten hold of Melanie. The dog bit a hole out of the cheek of Melanie about three-fourths of an inch long. Melanie was taken to the hospital in Jackson for first-aid treatment and then sent on to Memphis where she was treated by a plastic surgeon. Efforts to find the piece of flesh bitten out of her cheek were unsuccessful. The skin graft was very successful. While Melanie did not appear for trial in person pictures introduced showed the cheek to be completely healed with only a scar left. Her physician testified that when she was outdoors the scar would show up more because of the difference in pigmentation. In addition to the pain and suffering sustained by Melanie, her mother testified that she had become very much afraid of dogs and often had nightmares in which she

became highly excited and seemed to be dreaming that she was being attacked by a dog in her nightmares.

Plaintiffs-in-error insist that since there was no proof of viciousness or dangerous propensities of the dog which defendants knew about or should have known about, there is no liability of the defendants. They rely primarily upon the cases of Alex v. Armstrong, 215 Tenn. 276, 385 S.W.2d 110, and Missio v. Williams, 129 Tenn. 504, 167 S.W. 473, L.R.A.1915A, 500. In Missio v. Williams the defendant landowner permitted her brother to keep on her premises in the City of Memphis two vicious dogs who were known to be dangerous and vicious and there was a sign put up in the yard that the dogs were "bad dogs." The plaintiff was injured when she walked down the street and the dogs rushed out of the yard and inflicted serious injury upon her. Our Tennessee Supreme Court held that Mrs. Missio as the owner and occupant of the premises upon which her brother harbored the vicious dogs with her knowledge and consent was liable for the injuries inflicted upon the plaintiff. From the opinion we quote as follows;

"But the general rule at this time respecting the liability of owners or keepers of domestic animals for injuries to third persons is that the owner or keeper of domestic animals is not liable for such injuries, unless the animal was accustomed to injure persons, or had an inclination to do so, and the vicious disposition of the animal was known to the owner or keeper. Sherfey v. Bartley, 4 Sneed, 58, 67 Am.Dec. 597; Smith v. Causey, 22 Ala. 568; Le Forest v. Tolman, 117 Mass. 109, 19 Am.Rep. 400; Popplewell v. Pierce, 10 Cush. (Mass.) 509. And where an animal is accustomed or disposed to injure persons, and the owner or keeper

has notice or knowledge of that fact, he is liable for any injury which such animal may do to another person. As stated in Sherfey v. Bartley, supra, he is 'bound to have so confined him as to prevent him from doing mischief.' Loomis v. Terry, 17 Wend. (N.Y.) 496, 31 Am.Dec. 306. The gist of the action is the keeping of the animal with notice of its vicious disposition, and not the negligence of the owner in its custody. Empire Spring Co. v. Edgar, 99 U.S. 645, 25 L.Ed. 487. And if a person harbors a dog accustomed to bite, or allows it to frequent his premises, he is liable, although not the owner of it. Frammell v. Little, 16 Ind. 251; Marsh v. Jones, 21 Vt. 378, 52 Am.Dec. 67; Wilkinson v. Parrott, 32 Cal. 102. Knowledge of the owner or keeper that the dog is vicious is sufficient to sustain liability, without showing that it had ever bitten anyone. Rider v. White, 65 N.Y. 54, 22 Am.Rep. 600; Godeau v. Blood, 52 Vt. 251, 36 Am.Rep. 751.''

In Alex v. Armstrong the plaintiff, Mrs. Alex, was knocked down by a German Shepherd dog owned by the defendants, Mr. and Mrs. Armstrong, while the plaintiff was standing in the yard of a neighbor, Mrs. Marsh. The dog owned by the defendants, Mr. and Mrs. Armstrong, was playing in the Marsh front yard, running in circles chasing a dog belonging to Mrs. Marsh. The dog often played in the Marsh yard and Mrs. Marsh made no objection thereto.

The plaintiff brought suit for an alleged violation of T.C.A. Section 44-1408 which prohibits dogs to be allowed to run at large. The owners, Mr. and Mrs. Armstrong, were both employed and away from home at work during the day five days a week. On one occasion they had tied the dog to a chain hooked on a wire between two trees

on Armstrong property but the dog broke the chain and the Armstrongs made no further efforts to restrain the dog because they felt that she was not vicious or dangerous. Judgments were rendered in the Trial Court. The Court of Appeals reversed the judgments on two grounds: (1) that the Trial Court should have sustained a motion for directed verdict on the common law count of declaration, namely that there was insufficient evidence to charge the defendants with notice that the dog was of a vicious or dangerous disposition or propensity within the rules stated by Missio v. Williams and (2) that the Court of Appeals was further of the opinion that the dog was not running at large as contemplated by the statute. Our Tennessee Supreme Court affirmed the Court of Appeals' holding that there was insufficient evidence to charge the defendants with maintaining a vicious dog. The Supreme Court held that the evidence was sufficient to support a jury finding that the dog was running at large in violation of Section 44-1408. The decree of the Court of Appeals was reversed and the judgments of the Trial Court were reinstated.

In the case at bar the plaintiffs charged the defendants with negligence as follows:

"Plaintiff states, charges and avers that her aforesaid injuries and damages were directly and proximately caused by the defendants in one or more of the following negligent acts of the defendants:

1. By keeping and harboring a dog with vicious propensities and having a tendency to attack people.

2. By allowing said dog to be in a large crowd of people notwithstanding the loud noise, excitement and high temperature at said time and place.

3. By failing to keep a careful and close watch over said dog to insure that the dog would not bite passersby.

4. Failure to warn plaintiff of the dog's presence and likelihood plaintiff would be attacked by said dog.

5. Failure to keep said dog a safe distance from plaintiff.

6. Failure to restrain dog when attack on plaintiff was imminent.

7. Failure to promptly pull dog off plaintiff after attack was made.''

■■ While there was some evidence that the dog did bark at one of the neighbors, there was no evidence that the dog ever tried to bite any of the neighbors or that the owners of the dog ever knew of the barking. Therefore, we agree with plaintiffs-in-error that there is no evidence of knowledge on the part of the owners of the dog that it was vicious or possessed propensities to bite or injure other people. However, we are of opinion that there was ample evidence to support a finding by the jury of negligence on the part of Elaine McAbee in failing to keep the dog under control and preventing the animal from biting anyone, especially the plaintiff, Melanie Daniel, after Sgt. Murphy of the Jackson Police Department had warned her to be careful of the dog with so many children present. She had the dog on a short leash some five feet long and we think the jury would have been warranted in finding that Elaine should have and could have used the same effort to prevent the dog from biting Melanie that she used to prevent the dog fighting with the Collie dog which had come up several

minutes before. There is also ample evidence from which the jury could have found that Elaine was negligent in failing to restrain the dog after he had growled and pushed Melanie down on the curb and before he had actually bitten her.

The general rule with reference to the keeping of domestic animals is stated in 3 C.J.S. Animals sec. 145, page 1247, as follows:

"Rule Stated

The owner or keeper of domestic animals is liable for injuries inflicted by them only where he has been negligent, the animals were wrongfully in the place where they inflicted the injuries, or the injuries are the result of known vicious tendencies or propensities.

A person has a right to own or keep domestic animals of any kind provided they are so restrained as not to expose others engaged in their ordinary or lawful pursuits to danger. The owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and in so far as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them. Generally, however, if there has been no negligence in the performance of this duty (see infra sec. 149), and the injuries have not been inflicted in a place where the animal is wrongfully present (see infra sec. 148), or are not the result of a vicious or mischievous propensity of which he has knowledge or notice, the owner or

keeper of a domestic animal of a species not inclined to do mischief is not liable for injuries committed by it.''

With reference to the common law liability for the maintenance of dogs, the general rule is stated in 3 C.J.S., Animals, Section 151, page 1255 as follows:

"At common-law the owner of a dog is, in the absence of negligence, liable for injuries inflicted by it only where they are due to a vicious propensity of which he has knowledge or notice.''

In Henry v. Roach, 1956, 41 Tenn.App. 289, 293 S.W.2d 480, the plaintiff was injured when he went upon the premises of the defendants to make an estimate of the cost of some electrical work which the defendants contemplated doing. As he entered the front yard and was about halfway to the residence he was bitten by a dog owned by the defendants which was tied to a tree in defendants' yard. The dog was tied by a rope which was long enough for the dog to reach the walk along which the plaintiff was traveling to the house. The Trial Court granted defendants' motion for peremptory instructions apparently on the authority of Missio v. Williams, supra, namely that the defendants had no knowledge of the vicious propensities of the dog. This Court, speaking through the late and much lamented Judge Winfield Hale, reversed the case on the ground that there was ample evidence from which the jury could reasonably find that the defendant owners had knowledge that the dog had bitten or tried to bite other people previous to plaintiff's visit to their home.

In the case of Fortune v. Holmes, 1960, 48 Tenn.App. 497, 348 S.W.2d 894, this court upheld a judgment against a riding academy in favor of the plaintiff, a beginner who was thrown from a horse while taking her first riding lesson. In that case the proof was clear and uncontradicted that the horse named Queen furnished the plaintiff was a horse of no vicious habits or propensities; that she had been ridden by children and beginners many times prior to plaintiff's accident without any unfortunate results. This court held that there was evidence from which the jury could reasonably have found the riding master guilty of negligence in furnishing the plaintiff, a known beginner, a spirited horse with tender mouth equipped with a curb bit and bridle and guilty of negligence in instructing the plaintiff to kick the horse in the side and go around the track again after the horse had reared on her hind legs.

In the case of Groce Provision Co. v. Dortch, (1961), 49 Tenn.App. 57, 350 S.W.2d 409, this court, speaking through Judge Humphreys, now Justice Humphreys of the Tennessee Supreme Court, affirmed a judgment against the owner of a packing house in favor of a plaintiff who was injured when a bull escaped from the packing house onto the streets of Fayetteville, Tennessee, and while being chased by defendant's employees attacked Mrs. Dortch and knocked her to the concrete pavement. The bull was finally killed with a high powered rifle. The bull had been purchased by the defendant at its packing house in Fayetteville, Tennessee, for purposes of slaughter. It escaped from the scales pen located on the premises of the defendant into another portion of the building and while being chased within the building, it escaped

through an open door onto a loading ramp out into an alley.

One of the defendant's employees shot the bull with a .22 rifle. The shot had no effect except to make the bull angry and the bull then left the alley onto another lot which was enclosed and the gates were shut. Defendant's employee shot the bull again and he broke through the fence up onto a main thoroughfare where defendant's employee ran into the bull twice with an automobile but failed to stop the bull in its flight. The bull then saw the plaintiff, Mrs. Dortch, and inflicted the serious injuries to her. This court held that there was evidence from which the jury could reasonably find the defendants guilty of proximate negligence in permitting the animal to escape and proximate negligence in attempting to recapture the animal after it had escaped. Judge Humphreys make the following succinct statement of the applicable law:

"* * * That the owner of a domestic animal is bound to exercise such reasonable care to prevent it from injuring another as an ordinarily careful and prudent person would exercise under the same circumstances, and that, if the jury found from the facts that the defendant had not done this, in other words, found defendant was guilty of negligence in allowing it to escape and in not recapturing it, and that this negligence was the proximate and direct cause of the injuries and damages sustained by the plaintiff, the defendant would be liable. This is the law of the case. This is affirmed by Overbey v. Poteat, [206 Tenn. 146, 332 S.W.2d 197] supra, wherein it is recognized that negligence may be a basis of recovery even where the

owner of the animal has complied with T.C.A. sec. 44-1701 et seq. (See third from last paragraph, Overbey v. Poteat, supra.)''

As Judge Hale mentioned in the case of Henry v. Roach, supra, our Tennessee Legislature, by T.C.A. Sections 44-101 and 44-102, has made the liability of the owner of a dog absolute when such dog injures other livestock. We quote from Judge Hale's opinion as follows;

''This is the law in our state so far as it relates to human beings who have been bitten by a dog. But a more liberal rule applies to animals so injured. By ch. 45 Acts 1859-1860 no scienter was required when sheep were involved, and by ch. 262 Acts 1949, this was broadened to apply to 'livestock,' the statute, T.C.A. secs. 44-101, 44-102 reading:

'44-101. * * * Where any dog shall kill, or in any manner damage, any livestock in this state, the owner or harborer of such dog shall be liable, in an action for damage, to the owner of such livestock.

'44-102. * * * Ignorance of the vicious habits or character of the dog on the part of the owner shall be no defense in actions arising under sec. 44-101.'

The anomaly of not requiring notice of dangerous propensities so far as 'livestock' is concerned but requiring it when a human being is concerned is readily apparent and is difficult to understand. However, we must take the law as written and apply the rule in Missio v. Williams, supra.''

In view of this Legislative pronouncement we think the rule of Missio v. Williams should not be extended but kept within its factual limitations.

We hold that the scienter on the part of the defendant required by Missio v. Williams is not required in the case at bar where there is proof of negligence on the part of the defendant, Elaine McAbee, in failing to properly control the dog after being warned by Sgt. Murphy of the Jackson Police Department and proof of negligence in failing to restrain the dog from injuring other people and especially the plaintiff after the dog showed animus toward the plaintiff by growling at her and leaping up on her and shoving her down. Therefore, assignment of error No. II is respectfully overruled.

Assignments of error V and VI complain of the action of the Trial Judge in failing to grant defendants' motions for directed verdict. They are overruled for the reasons set out under assignment of error No. II.

Assignment of error No. VII insists that the court erred in charging the jury that the plaintiffs could recover against the defendants even though the defendants had no knowledge of the dog's vicious propensities. The portion of the charge complained of is set out in the assignment of error. The charge conforms to the law declared in the discussion under assignment of error No. II and therefore assignment of error No. VII is respectfully overruled.

Assignments of error VIII, IX, X and XI complain of the action of the Trial Judge in refusing to charge defendants' special requests Nos. 1, 2, 3, and 4. All four of these special requests are predicated upon the defense that scienter on the part of the owner of the dog was indispensable to a recovery of damages inflicted by the dog. For the reasons set out under assignment of error No. II these assignments are respectfully overruled.

Assignment of error No. IV insists that the court erred in failing to grant defendants' motion for mistrial following the plaintiffs' voir dire examination of the jury in his repeated and deliberate injection of the subject of ''homeowners insurance'' into the case. A sample of the questions complained of are as follows:

''MR. DUKE: Do any of you have a dog that you keep in the house?

No audible answers.

MR. DUKE: All of you remaining silent, I take it that you do not. Do you work for any insurance company, for instance, that might write what is commonly called a homeowner's insurance policy?

No audible answers.

MR. DUKE: Do any of you work for an adjusting firm that might be involved in the adjustment of claims for insurance companies?

No audible answers.

MR. DUKE: Do any of you work for any insurance company of any kind?

No audible answers.

MR. DUKE; Do any of you own stock in any insurance company?

Two veniremen answer in affirmative.

MR. DUKE: What kind of insurance company?

First Venireman to Answer: Life.

Second Venireman to answer: Life.

MR. DUKE: Would the fact that being stockholders in a life insurance company influence you in any way?

Each Venireman answered in the negative.

MR. DUKE: Does anyone of you have anyone in your immediate family that works for an insurance company?

A VENIREMAN: I have a brother-in-law.

MR. DUKE; What kind of insurance company does he work for?

VENIREMAN: Life insurance.

MR. DUKE: Life insurance. Do any of you have anyone in your immediate family that works for an agency, an insurance agency that writes what is commonly called a homeowners insurance policy?

A VENIREMAN: I have a brother that works for the Prudential.

MR. DUKE: The Prudential?

THE VENIREMAN: Yes, sir.

MR. DUKE: That is strictly a life insurance company isn't it?

THE VENIREMAN: I think it is.

MR. DUKE. There is nothing about that that would influence your decision in any way, is there?

THE VENIREMAN: No, sir."

■ Plaintiffs-in-error contend that under the authority of Woods v. Meacham, 46 Tenn.App. 711, 333 S.W.2d 567, they were entitled to a mistrial. Mention of the

insurance in the present case falls far short of the action of attorneys criticized in Woods v. Meacham. In Swift v. Wimberley, (1963), 51 Tenn.App. 532, 370 S.W.2d 500, opinion by Judge Bejach of this court who also prepared the opinion in Woods v. Meacham, this court affirmatively approved the practice of asking prospective jurors on their voir dire examination if any prospective juror worked for a liability insurance company or had stock in such company in order that the attorney might more intelligently use his peremptory challenges or challenges for cause. The action complained of in the present case was approved in Swift v. Wimberly and assignment of error No. IV is respectfully overruled.

Assignment of error No. III insists that the verdicts are excessive and so excessive as to indicate passion, prejudice or unaccountable caprice. The proof shows that the plaintiff, Melanie, has a permanent scar on her face from the dog bite. In later years it is expected that she will undergo another skin graft which will in all probability materially reduce the disfiguration and discoloration of the scar. The Trial Judge approved the judgment of $5,000 without remittitur. There is no evidence of misconduct on the part of the jury and we do not feel that we should disturb the verdict or reduce it further. With reference to the judgment for $2,250 in favor of the father for medical expenses and loss of services the proof shows that he had sustained $650 actual medical expenses for the treatment of his daughter up to the time of the trial. The plastic surgeon testified that foreseeable future medical treatment would approximate $1,100 or $1,200. We do not think we should reduce the judgment of $2,250.

It follows that all the assignments of error having been overruled, the judgments of the lower court must be affirmed. The costs of the appeal will be taxed to the plaintiffs-in-error.

Avery, P. J. (W. S.), and Bejach, J., concur.